Nos. 2014-1282, 2014-1291

# United States Court of Appeals
# for the Federal Circuit

APOTEX INC.,

*Plaintiff-Appellant*,

v.

DAIICHI SANKYO, INC. AND DAIICHI SANKYO CO., LTD.,

*Defendants-Appellees,*

and

MYLAN PHARMACEUTICALS INC.,

*Movant-Cross-Appellant*.

Appeals from the United States District Court for the Northern District of Illinois, in Case No. 12-cv-09295, Judge Sharon Johnson Coleman

## CORRECTED COMBINED OPENING AND RESPONSE BRIEF OF CROSS-APPELLANT MYLAN PHARMACEUTICALS INC.

Michael D. Shumsky
John K. Crisham
Stephen S. Schwartz
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

*Counsel for Movant/Cross-Appellant
Mylan Pharmaceuticals Inc.*

July 14, 2014

# CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4, I hereby certify as follows:

1.     The full name of every party represented by me in this appeal is:

Mylan Pharmaceuticals Inc.

2.     The name of the real party in interest, if different from the above, is:

Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Mylan Pharmaceuticals Inc. is wholly owned by Mylan Inc.

4.     The names of all attorneys and law firms whose partners or associates have appeared for the party identified above in the lower tribunal or who are expected to appear for the party in this appeal are:

D. Joseph Piech
Sarah P. Herlihy
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654

Jay P. Lefkowitz, P.C.
Steven J. Menashi
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Michael D. Shumsky
John K. Crisham
Stephen S. Schwartz
KIRKLAND & ELLIS LLP
655 Fifteenth Street N.W.
Washington, D.C. 20005

/s/ Michael D. Shumsky
Michael D. Shumsky
KIRKLAND & ELLIS LLP

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

STATEMENT OF RELATED CASES ...................................... 6

JURISDICTIONAL STATEMENT .......................................... 7

STATEMENT OF THE ISSUES ............................................... 7

STATEMENT OF THE CASE AND THE FACTS ..................... 7

    A.    Relevant Statutory and Regulatory Background .................. 7

    B.    Facts and Procedural History ................................................. 14

        1.    Benicar® and Mylan's Paragraph IV ANDA For Generic Olmesartan. ..................................................... 14

        2.    Apotex's ANDA and This Lawsuit. ............................. 16

SUMMARY OF ARGUMENT .................................................. 19

STANDARDS OF REVIEW ..................................................... 22

ARGUMENT ............................................................................ 25

I.    The District Court Erred In Denying Mylan's Motion To Intervene As "Moot." ..................................................... 25

    A.    Mylan Has A Legally Protectable Interest That Apotex's Lawsuit Is Deliberately Intended To Destroy. ...... 26

        1.    The Sole Purpose Of This Litigation Is To Impair Mylan's Statutory Right To 180-Day Exclusivity. ...... 26

        2.    Mylan's Interest Is Not Moot. ...................................... 28

    B.    Mylan Meets The Remaining Criteria For Intervention As Of Right. .......................................................................... 32

        1.    Mylan's Intervention Was Timely. ............................... 33

2.   No Party Adequately Represents Mylan's Interests. .................................................................... 34

C.   At Minimum, Mylan Should Have Been Allowed To Intervene Permissively. .......................................... 35

II.   This Court Should Affirm The Dismissal Of Apotex's Lawsuit. ............................................................................. 36

A.   The District Court Erred In Denying Mylan's Motion To Dismiss As Moot. ................................................. 37

B.   Apotex's Alleged Injury Is Insufficient To Ground Article III Standing. .................................................. 38

C.   This Lawsuit Cannot Redress Apotex's Alleged Injury In Any Event. ........................................................ 42

D.   Apotex's Alternative Arguments For Subject-Matter Jurisdiction Are Meritless. ..................................... 45

1.   This Court's Decision In *Janssen* Is Directly On Point And Forecloses Jurisdiction. ............................... 46

2.   Regional Circuit Law Forecloses Jurisdiction Here. ........................................................................ 53

CONCLUSION ....................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Aljabri v. Holder,*
    745 F.3d 816 (7th Cir. 2014) .......................................................... 24

*Allen v. Wright,*
    468 U.S. 737 (1984) ......................................................................... 58

*Already, LLC v. Nike, Inc.,*
    133 S. Ct. 721 (2013) ...................................................................... 28

*Anderson v. Chrysler Corp.,*
    99 F.3d 846 (7th Cir. 1995) ............................................................ 23

*Apotex Inc. v. Eisai Inc.,*
    No. 1:09-cv-477, 2010 WL 3420470 (M.D.N.C. Aug. 27, 2010) ...... 48

*Apotex, Inc. v. FDA,*
    No. 06-0627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ................ 26

*Apotex, Inc. v. Sebelius,*
    700 F. Supp. 2d 138 (D.D.C. 2010),
    *aff'd* 384 Fed. App'x 4 (D.C. Cir. 2010) ............................ 6, 14, 44, 45

*Apotex, Inc. v. Sebelius,*
    131 S.Ct. 1000 (2011) .................................................................... 45

*Arkansas Louisiana Gas Co. v. Hall,*
    453 U.S. 571 (1981) ........................................................................ 41

*Barrett v. United States,*
    423 U.S. 212 (1976) ........................................................................ 43

*Brunet v. City of Columbus,*
    1 F.3d 390 (6th Cir. 1993) .............................................................. 56

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.,*
    527 F.3d 1278 (Fed. Cir. 2008) ......................... 45, 46, 47, 52, 53, 55

iii

*Chafin v. Chafin*,
    133 S. Ct. 1017 (2013) ...................................................................28

*Church of Scientology of Cal. v. United States*,
    506 U.S. 9 (1992) ...........................................................................29

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) .......................................................38, 40, 55

*Daiichi Sankyo Co. v. Matrix Labs. Ltd.*,
    619 F.3d 1346 (Fed. Cir. 2010) .................................................16, 34

*Dey Pharma, LP v. Sunovion Pharms. Inc.*,
    677 F.3d 1158 (Fed. Cir. 2012) .................................................50, 53

*Doe v. County of Montgomery, Ill.*,
    41 F.3d 1156 (7th Cir. 1994) .......................................................23

*Eli Lilly & Co. v. Medtronic, Inc.*,
    496 U.S. 661 (1990) .....................................................................10

*Flying J Inc. v. City of New Haven*,
    549 F.3d 538 (7th Cir. 2008) .......................................................24

*Flynn v. Sandahl*,
    58 F.3d 283 (7th Cir. 1995) .........................................................29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000) .....................................................................36

*Fromson v. Advance Offset Plate, Inc.*,
    755 F.2d 1549 (Fed. Cir. 1985) ...................................................24

*Fulani v. Brady*,
    935 F.2d 1324 (D.C. Cir. 1991) ...................................................57

*Fund For Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) .....................................................35

*Hager v. City of W. Peoria*,
    84 F.3d 865 (7th Cir. 1996) .........................................................23

*Huddy v. FCC,*
236 F.3d 720 (D.C. Cir. 2001) ........................................................57

*Illinois v. City of Chicago,*
137 F.3d 474 (7th Cir. 1998) ........................................................24

*Janssen Pharmaceutica, N.V. v. Apotex, Inc.,*
540 F.3d 1353 (Fed. Cir. 2008) ........................ 46, 47, 48, 49, 52, 53

*Kathrein v. City of Evanston, Ill.,*
752 F.3d 680 (7th Cir. May 15, 2014).............................................23

*Killian v. Concert Health Plan,*
742 F.3d 651 (7th Cir. 2013) ........................................................29

*Knox v. Service Employees Int'l Union, Local 1000,*
132 S. Ct. 2277 (2012) ........................................................29

*Lake Investors Dev. Grp., Inc. v. Egidi Dev. Grp.,*
715 F.2d 1256 (7th Cir. 1983) .............................................31, 34, 35

*Los Angeles v. Lyons,*
461 U.S. 95 (1983) ........................................................38

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................37, 42

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ........................................................3

*Mova Pharm. Corp. v. Shalala,*
140 F.3d 1060 (D.C. Cir. 1998) .............................................31, 35, 48

*Mylan Pharms. Inc. v. FDA,*
789 F. Supp. 2d 1 (D.D.C. 2011) .............................................13, 26

*Nader v. Blackwell,*
545 F.3d 459 (6th Cir. 2008) ........................................................56

*Nissei Sangyo Am., Ltd. v. United States,*
31 F.3d 435 (7th Cir. 1994) .............................................25, 33, 34

*Northwest Airlines, Inc. v. FAA,*
  795 F.2d 195 (D.C. Cir. 1986) ........................................ 41

*Novamedix, Ltd. v. NDM Acquisition Corp.,*
  166 F.3d 1177 (Fed. Cir. 1999) ..................................... 54

*Parvati Corp. v. City of Oak Forest,*
  630 F.3d 512 (7th Cir. 2010) ......................................... 56

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ...................................................... 56

*People Who Care v. Rockford Bd. of Educ.,*
  68 F.3d 172 (7th Cir. 1995) ............................ 23, 25, 33

*Petro-Chem Processing, Inc. v. EPA,*
  866 F.2d 433 (D.C. Cir. 1989) ....................................... 56

*Pfizer Inc. v. Shalala,*
  182 F.3d 975 (D.C. Cir. 1999) ....................................... 42

*Powell v. McCormack,*
  395 U.S. 486 (1969) ...................................................... 28

*Puffer v. Allstate Ins. Co.,*
  675 F.3d 709 (7th Cir. 2012) ......................................... 32

*Purepac Pharm. Co. v. Thompson,*
  354 F.3d 877 (D.C. Cir. 2004) ......................................... 8

*Quincy Mall, Inc. v. Parisian, Inc.,*
  27 Fed. App'x 631 (7th Cir. 2001) ................................ 23

*Sandoz, Inc. v. FDA,*
  439 F. Supp. 2d 26 (D.D.C. 2006) ................................ 27

*Schoenfeld v. Apfel,*
  237 F.3d 788 (7th Cir. 2001) ......................................... 32

*Serono Labs., Inc. v. Shalala,*
  158 F.3d 1313 (D.C. Cir. 1998) ....................................... 8

*Shamrock Tech. v. Medical Sterilization Inc.,*
  903 F.2d 789 (Fed. Cir. 1990) ......................................... 24

*Shea v. Angulo,*
  19 F.3d 343 (7th Cir. 1994) ............................................ 33

*Shoreham-Wading River Cent. Sch. Dist. v. U.S. Nuclear Regulatory Comm'n,*
  931 F.2d 102 (D.C. Cir. 1991) ......................................... 57

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ................................................. 42, 56

*Sokaogon Chippewa Comm. v. Babbitt,*
  214 F.3d 941 (7th Cir. 2000) .......................................... 23

*Stauffer v. Brooks Bros., Inc.,*
  619 F.3d 1321 (Fed. Cir. 2010) ....................................... 22

*Steel Co. v. Citizens for Better Env't,*
  523 U.S. 83 (1998) ................................................. 24, 37

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................... 41, 58

*Sun Studs, Inc. v. Applied Theory Assocs., Inc.,*
  772 F.2d 1557 (Fed. Cir. 1985) ....................................... 54

*Teva Pharms. USA, Inc. v. Eisai Co.,*
  620 F.3d 1341 (Fed. Cir. 2010) ................................. 46, 52, 53

*Teva Pharms. USA, Inc. v. Sebelius,*
  595 F.3d 1303 (D.C. Cir. 2010) ....................... 6, 10, 14, 26, 44

*Teva Pharms. USA, Inc. v. Sebelius,*
  638 F. Supp. 2d 42 (D.D.C. 2009),
  *vacated on other grounds* 595 F.3d 1303 (D.C. Cir. 2010) ............ 42

*Teva Pharms., USA, Inc. v. Leavitt*
  548 F.3d 103 (D.C. Cir. 2008) ...................................... 9, 10

*Toxgon Corp. v. BNFL, Inc.*,
    312 F.3d 1379 (Fed. Cir. 2002) ....................................................... 22

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972) ......................................................................... 34

*Tylka v. Gerber Prods. Co.*,
    211 F.3d 445 (7th Cir. 2000) .......................................................... 32

*United States v. Lawrence*,
    535 F.3d 631 (7th Cir. 2008) .......................................................... 24

*Warth v. Seldin*,
    422 U.S. 490 (1975) ......................................................................... 38

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .................................................................. 38, 41

*Yassan v. J.P. Morgan Chase & Co.*,
    708 F.3d 963 (7th Cir. 2013) .......................................................... 31

## Statutes

21 U.S.C. § 355(b)(1) ............................................................................ 8

21 U.S.C. § 355(b)(1)(G) ...................................................................... 8

21 U.S.C. § 355(c)(2) ............................................................................ 8

21 U.S.C. § 355(j) .................................................................................. 9

21 U.S.C. § 355(j)(2)(A) ...................................................................... 12

21 U.S.C. § 355(j)(2)(A)(i) .................................................................. 12

21 U.S.C. § 355(j)(2)(A)(ii) ................................................................. 12

21 U.S.C. § 355(j)(2)(A)(iii) ............................................................... 12

21 U.S.C. § 355(j)(2)(A)(iv) ............................................................... 12

21 U.S.C. § 355(j)(2)(A)(v) ................................................................ 12

21 U.S.C. § 355(j)(2)(A)(vi) ................................................................ 12

21 U.S.C. § 355(j)(2)(A)(vii) ..........................................................9, 12

21 U.S.C. § 355(j)(5)(B)(ii) ................................................................ 10

21 U.S.C. § 355(j)(5)(B)(iii)(III) ........................................................ 52

21 U.S.C. § 355(j)(5)(B)(iv) ............................................................... 10

21 U.S.C. § 355(j)(5)(B)(iv)(I) ........................................................... 10

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) ........................................... 12

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(BB) ........................................... 13

21 U.S.C. § 355(j)(5)(C)(i)(I)(aa) ....................................................... 53

21 U.S.C. § 355(j)(5)(C)(i)(I)(bb) ....................................................... 53

21 U.S.C. § 355(j)(5)(C)(i)(I)(cc) ....................................................... 53

21 U.S.C. § 355(j)(5)(D)(i)(I) ............................................................. 11

21 U.S.C. § 355(j)(5)(D)(i)(I)(aa) ....................................................... 12

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb) .............................................5, 12, 43, 51

21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) .............................................. 27

21 U.S.C. § 355a ................................................................................. 14

28 U.S.C. § 1295(a)(1) .......................................................................... 7

28 U.S.C. § 1331 ................................................................................... 7

28 U.S.C. § 1338(a) .............................................................................. 7

28 U.S.C. § 2201(a) ............................................................................. 51

35 U.S.C. § 271(e)(2) .......................................................................... 10

35 U.S.C. § 41(b) ................................................................................ 15

## Regulations

21 C.F.R. § 314.127 ...................................................................... 12

37 C.F.R. § 1.362 ........................................................................ 15

## Rules

Fed. R. App. P. 4 ........................................................................ 29

Fed. R. Civ. P. 24(a)(2) .............................................................. 25

Fed. R. Civ. P. 24(b)(1)(B) ........................................................ 35

## INTRODUCTION

This cross-appeal challenges the district court's denial of proposed intervenor-defendant Mylan Pharmaceuticals Inc.'s motions to intervene and to dismiss Apotex Inc.'s amended complaint for lack of subject-matter jurisdiction. In a single sentence, the district court held that both of Mylan's motions were "moot" because the Court simultaneously granted the combined motion to dismiss filed by defendants-appellees Daiichi Sankyo, Inc. and Daiichi Sankyo Co., Ltd. (together, "Daiichi"). The district court's decision fundamentally misconstrues the concept of mootness, disregards Mylan's continuing interest in the disposition of this litigation, and denies Mylan the very right to participate that intervention is intended to provide—including the right to participate as a full party on appeal in this Court.

That is so because the sole purpose of this litigation (including Apotex's appeal from the district court's dismissal of its complaint) is to engineer a forfeiture of Mylan's statutory right to 180 days of marketing exclusivity for generic Benicar® (olmesartan medoximil) tablets—an exclusivity right Mylan earned by mounting the first successful challenge to Daiichi's patent rights, and which in turn rewards Mylan's

initiative by precluding FDA from approving Apotex's application for this drug until six months after Mylan begins selling its product. Given that the admitted objective of Apotex's lawsuit is to eviscerate Mylan's statutory right to marketing exclusivity, there is no question that Mylan was and remains entitled to intervene in order to protect its interests: Like every other statutory right, 180-day generic exclusivity is a legally protectable interest, so courts routinely allow exclusivity-entitled applicants to intervene for purposes of defending such exclusivity from a subsequent applicant's challenge.

Contrary to the district court's *ipse dixit*, Mylan's interests here—both in intervening and in the merits—are no less "live" today than they were the day this lawsuit was filed. So long as there was a possibility that Apotex might appeal from the district court's dismissal of its lawsuit, Mylan's exclusivity remained in jeopardy. And as Apotex's timely appeal from that decision and opening brief here make abundantly clear, Apotex still seeks to deprive Mylan of statutory right to 180-day exclusivity. Mylan therefore has the very same interest in defending its exclusivity today that it had when it moved to intervene below, and unless and until Apotex abandons its attempt to divest

Mylan of its statutory right to exclusivity, Mylan is entitled to intervene in defense of its statutory right to exclusivity.

As for the merits, the district court properly recognized that it lacked subject-matter jurisdiction over Apotex's complaint—and thus should have granted Mylan's motion to dismiss after granting Mylan the intervention it improperly withheld. The Declaratory Judgment Act grants jurisdiction only over cases that otherwise "are justiciable under Article III," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), and that of course means the plaintiff must have standing at all times. But Apotex's asserted injury is entirely speculative: It claims that Mylan's statutory right to 180-day exclusivity *might* delay FDA from approving Apotex's generic Benicar® *if* Apotex cannot pursue this lawsuit, and asserts that *if* this lawsuit succeeds, the effect *could* "cause competition from multiple generics [presumably including Apotex] on day 1 after the '599 patent expires." Blue Br. at 24.

Maybe so, maybe not. It is far from clear that Mylan's exclusivity would have *any* impact on the timing of Apotex's entry into the market, because there is no guarantee FDA will *ever* approve Apotex's application or that Apotex will *ever* be in position to lawfully sell its

3

generic product in the United States. After all, it is undisputed that FDA has not even granted Apotex's olmesartan application a "tentative approval," which means that Apotex has not yet shown that its application meets the requisite scientific standards for an approval. Perhaps Apotex will cure the deficiencies in its file at some point in the future. Perhaps it won't. But as things stood the day Apotex filed this case; the day the district court dismissed this case; and as things still stand today, the whole premise for Apotex's lawsuit—that Apotex will become eligible for approval *before* Mylan's 180-day exclusivity period expires, and so needs to eliminate the "injury" caused by Mylan's statutory right to exclude Apotex from the market—depends on counterfactual speculation about future FDA action on Apotex's currently unapprovable application. The speculative and contingent nature of Apotex's asserted injury is insufficient to confer Article III standing, and the company's complaint was properly dismissed for lack of jurisdiction.

For much the same reason, Apotex lacks standing because the judgment Apotex seeks would not redress its supposed injury (even if that injury were not speculative and contingent on hypothetical future

4

events).  Though Apotex argues that the non-infringement judgment it seeks would cause Mylan to "forfeit" its exclusivity, the plain language of the statute—which Apotex never quotes—instead provides that the forfeiture-triggering non-infringement judgment must be secured "in a declaratory judgment action ***brought by [another] applicant ... which other applicant has received tentative approval***."  21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) (emphasis added).  Like the statute says, that means the declaratory-judgment plaintiff seeking to cause a forfeiture must "ha[ve] received tentative approval" (present perfect tense, denoting a completed act) when it "brought" the action (past tense, likewise denoting a completed act) in order for the court's judgment to cause a forfeiture.  But Apotex did ***not*** have tentative approval when it brought this lawsuit (and still lacks tentative approval today), so the judgment it seeks cannot cause the forfeiture of Mylan's exclusivity right in any event.  Because this lawsuit would not redress Apotex's alleged injury, Apotex lacks standing.

Finally, even if Apotex could replace the statute's text with its self-serving paraphrase, the judgment it is seeking still would not affect Mylan's exclusivity and thus would not redress Apotex's alleged injury

because (as Apotex concedes, Blue Br. at 23-24) the courts repeatedly have held that a brand manufacturer cannot deprive the first generic applicant of its exclusivity right by abandoning the challenged patent which grounds the first applicant's exclusivity. *Teva Pharms. USA, Inc. v. Sebelius* [*Teva v. Sebelius*], 595 F.3d 1303 (D.C. Cir. 2010); *Apotex, Inc. v. Sebelius*, 700 F. Supp. 2d 138 (D.D.C. 2010), *aff'd* 384 Fed. App'x 4 (D.C. Cir. 2010). But if Daiichi's abandonment of the '703 patent can't deprive Mylan of its exclusivity on its own—as Apotex expressly concedes—then a contrived judgment declaring that Daiichi abandoned its patent can't deprive Mylan of its exclusivity either. Any other result would wipe those cases off the books and thoroughly undermine Congress's intent.

For these and other reasons detailed below, the district court should have granted Mylan's motions to intervene and to dismiss Apotex's lawsuit for lack of subject-matter jurisdiction.

## STATEMENT OF RELATED CASES

We are not aware of any other related cases that have been, or currently are, pending before this Court or any other court of appeals.

## JURISDICTIONAL STATEMENT

Apotex filed this lawsuit seeking a judgment of non-infringement, purporting to invoke the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). The court concluded that it lacked subject-matter jurisdiction and dismissed. The court then denied Mylan's motions to intervene and to dismiss as "moot," and entered a final judgment on January 9, 2014. Apotex timely filed a notice of appeal on February 4, 2014, and Mylan timely filed a notice of cross-appeal on February 6, 2014. This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in denying Mylan's motions to intervene and dismiss as "moot."

2. Whether the district court's judgment dismissing this case for lack of subject-matter jurisdiction nonetheless should be affirmed.

## STATEMENT OF THE CASE AND THE FACTS

### A. Relevant Statutory and Regulatory Background

Prescription drug approvals are governed by the Food, Drug, and Cosmetic Act ("FDCA"), as modified by the Drug Price Competition and Patent Restoration Act of 1984 ("Hatch-Waxman Act"), Pub. L. No. 98-

417, 98 Stat. 1585, and the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066.  To secure approval for a brand-name drug, the sponsor must submit a New Drug Application ("NDA") with clinical data proving the drug's safety and efficacy. 21 U.S.C. § 355(b)(1).[1]  Once approved, the NDA holder must identify each patent for "which a claim of patent infringement could reasonably be asserted if [someone else] engaged in the manufacture, use, or sale of the drug."  21 U.S.C. §§ 355(b)(1)(G), (c)(2). FDA publishes this information in the so-called "Orange Book." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004).

Generic drugs contain the same active ingredients and provide the same therapeutic benefits as brand-name drugs.  But before Congress passed Hatch-Waxman, generic companies had to submit a full NDA—including new clinical trial data—to obtain approval.  That made generic entry cost-prohibitive, so Hatch-Waxman removed the clinical-trial barrier in order to reduce prescription-drug costs.  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998).  Because two

---

[1]    Unless otherwise noted, all citations are to the MMA version of the statute, which all agree applies here.

8

drugs with the same chemical and biological properties will be equally
safe and effective, Hatch-Waxman allows for generic approval whenever
an Abbreviated New Drug Application ("ANDA") shows that the
proposed generic drug has the same active ingredient and is
bioequivalent to a previously approved drug.  21 U.S.C. § 355(j).

Each ANDA must also include a "certification" to every Orange
Book patent for the branded drug.  *Id*. § 355(j)(2)(A)(vii).  Two such
certifications are relevant here: [1] a "Paragraph III" certification,
which bars FDA approval until the referenced patent expires; and [2] a
"Paragraph IV" certification, which asserts that a listed patent is
invalid, unenforceable, or will not be infringed by the proposed generic,
and thus should not delay approval.  *Id*.

Paragraph IV certifications play a critical role in the statutory
scheme by allowing for expedited generic entry through the elimination
of patent barriers.  *Teva Pharms., USA, Inc. v. Leavitt* [*Teva v. Leavitt*],
548 F.3d 103, 106 (D.C. Cir. 2008).  But filing such a certification is
risky.  It is both challenging and expensive to develop a non-infringing
version of the drug or a legal challenge to the patent.  And the statute
makes the mere filing of a Paragraph IV certification an act of patent

9

infringement that often results in years of costly litigation. 35 U.S.C. § 271(e)(2); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990). Indeed, where the brand manufacturer sues within forty-five days of such a certification, FDA may not approve the ANDA for thirty months. 21 U.S.C. § 355(j)(5)(B)(ii).  This is known as the "30-month stay."

To encourage generic companies to take such risks, Hatch-Waxman rewards the first Paragraph IV challenger with a 180-day period during which no other generic version of the drug can be approved.  21 U.S.C. § 355(j)(5)(B)(iv).  This exclusivity period is "valuable, designed to compensate manufacturers for research and development costs as well as the risk of litigation." *Teva v. Leavitt*, 548 F.3d at 104.  And it is "a pro-consumer device" that "Congress has chosen to induce challenges to patents." *Teva v. Sebelius*, 595 F.3d at 1318.  Under the MMA, the 180-day exclusivity period begins to run when the first Paragraph IV applicant first sells its drug.  21 U.S.C. § 355(j)(5)(B)(iv)(I).

Marketing exclusivity can be "forfeited," though, if the first applicant fails to start selling its drug by certain deadlines. In particular, the applicant can forfeit its exclusivity if it:

fails to market the drug by ***the later of***—

> ***(aa)*** the earlier of the date that is—
>
>> (AA) 75 days after the date on which the approval of the [ANDA] of the first applicant is made effective…; or
>>
>> (BB) 30 months after the date of submission of the [ANDA] of the first applicant; ***or***
>
> ***(bb)*** with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted [a paragraph IV certification], at least 1 of the following has occurred:
>
>> (AA) … a court enters a final decision … that the patent is invalid or not infringed.
>>
>> (BB) … a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.
>>
>> (CC) The patent information submitted under subsection (b) or (c) of this section is withdrawn by the [NDA] holder.

21 U.S.C. § 355(j)(5)(D)(i)(I) (emphases added).

Under this "failure-to-market trigger," the first applicant thus can lose exclusivity on "the later of" two dates. The first date is either 75 days after FDA finally approves the first applicant's ANDA (thereby enabling the first applicant to sell its product lawfully in the United States) or 30 months after ANDA submission, whichever arrives first.

11

*Id.* § 355(j)(5)(D)(i)(I)(aa).   The second date is 75 days after the first applicant, or another generic applicant whose ANDA already "has received tentative approval," obtains (as relevant here) a final court decision of non-infringement.   *Id.* § 355(j)(5)(D)(i)(I)(bb).   Once ***both*** events occur—*i.e.*, one from the (aa) subsection ***and*** one from the (bb) subsection—exclusivity can be forfeited 75 days after "the later" of the two possible dates ***if*** the first applicant has not begun to sell its product.

The statute's incorporation of the "tentative approval" standard in the forfeiture provision is particularly notable here.   Hatch-Waxman provides for two types of approvals: a "tentative approval" and a "final" (or "effective") approval.   A tentative approval represents FDA's judgment "that an [ANDA] meets the requirements of [21 U.S.C. § 355(j)(2)(A)], but cannot receive effective approval" until some future date because of a patent-based or regulatory exclusivity period (such as a thirty-month stay due to patent litigation, or a 180-day generic exclusivity period).   21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA).   In turn, section 355(j)(2)(A) establishes the substantive standards for ANDA approval.   *Id.* § 355(j)(2)(A)(i)-(vii); *see also* 21 C.F.R. § 314.127. "Tentative approval" therefore indicates that "all scientific and

procedural conditions for approval have been met, but the application cannot be fully approved because [of] a [regulatory exclusivity period] or some other barrier … arising from patent infringement litigation." *Mylan Pharms. Inc. v. FDA*, 789 F. Supp. 2d 1, 3 (D.D.C. 2011) (quotation omitted). Tentative approval thus is a critical threshold: While it does not allow for market entry, 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(BB), it signals that FDA's scientific review of an ANDA is essentially complete and that the proposed generic drug would be safe and effective.   By the same token, FDA's failure to grant tentative approval indicates the presence of substantive shortcomings in an ANDA that must be remedied before the drug can be sold.

These forfeiture triggers have spawned considerable litigation, but by now it is well settled that brand-name manufacturers cannot manipulate the statutory incentive for challenging listed patents by stripping the first patent challenger of its exclusivity.   As the D.C. Circuit repeatedly has explained, the statute simply does not permit "a scenario in which the brand maker can unilaterally deprive the generic of its exclusivity," whether by abandoning a listed patent or causing its

premature expiration.  *Teva v. Sebelius*, 595 F.3d at 1317; *Apotex*, 384 Fed. App'x at 4.

## B.    Facts and Procedural History

### 1.    Benicar® and Mylan's Paragraph IV ANDA For Generic Olmesartan.

Daiichi holds the approved NDA for the blood-pressure medication Benicar® (olmesartan medoxomil), App. 47, Am. Compl. ¶ 22, and has listed two patents in the Orange Book: U.S. Patent No. 5,616,599 ("the '599 patent"), which is scheduled to expire on April 25, 2016, and the '703 patent, which originally was scheduled to expire on November 19, 2021.  *Id*. ¶ 23.  After studying the use of olmesartan in juvenile patients, Daiichi also earned a period of "pediatric exclusivity" that would bar FDA's approval of generic applications referencing Benicar® for six months beyond the scheduled expiration date of each patent.  *See* 21 U.S.C. § 355a.  Absent a Paragraph IV challenge, Daiichi's patents thus would have blocked generic market entry until May 19, 2022.

On April 25, 2006, Mylan filed the first ANDA referencing Benicar®, and Mylan's ANDA included the first-filed Paragraph IV certifications to both listed patents.  App. 49, Am. Compl. ¶ 31.  Mylan therefore earned 180-day exclusivity, as Apotex's complaint expressly

concedes. App. 50, Am. Compl. ¶ 33 ("Mylan retains a 180-day first generic applicant exclusivity.").

On July 11, 2006, Daiichi responded to notice of Mylan's Paragraph IV challenges by disclaiming the '703 patent—effectively conceding that Mylan's challenge to the patent was so strong that the patent was not worth defending. App. 46, Am. Compl. ¶ 18. Not surprisingly, Daiichi then ceased paying the maintenance fees that are required to keep a patent active. App. 46, Am. Compl. ¶ 19; *see also* 35 U.S.C. § 41(b); 37 C.F.R. § 1.362. Mylan's Paragraph IV certification to the '703 patent thus accomplished precisely what Hatch-Waxman rewards: It identified weaknesses in a competition-blocking patent; prepared a Paragraph IV challenge that caused Daiichi to abandon that patent; and thereby opened the market to competition years before the '703 patent otherwise would have allowed absent Mylan's Paragraph IV challenge (again, that patent and its associated pediatric exclusivity would have blocked generic entry until May 2022 absent Mylan's Paragraph IV challenge).

Daiichi did not, however, abandon the '599 patent. Instead, Daiichi responded to Mylan's Paragraph IV certification by suing Mylan

15

for patent infringement on July 31, 2006.  The district court sided with Daiichi, and this Court affirmed.  *Daiichi Sankyo Co. v. Matrix Labs. Ltd.*, 619 F.3d 1346 (Fed. Cir. 2010); *see also* App. 49, Am. Compl. ¶ 31.  As a result, Mylan's Paragraph IV certification to the '599 patent was converted to a Paragraph III certification—which effectively bars Mylan's approval until the pediatric exclusivity period associated with the '599 patent expires in 2016.  App. 49-50, Am. Compl. ¶ 32.  Despite Mylan's failure to invalidate the '599 patent, however, its challenge to the '703 patent nonetheless will permit generic competition to begin ***more than five years*** before the '703 patent would have allowed—in 2016, when the '599 patent's period of pediatric exclusivity expires, rather than 2022, when the '703 patent's pediatric exclusivity would have expired absent Mylan's pathbreaking Paragraph IV challenge.  As Apotex concedes, Mylan thus remains fully entitled to 180-day exclusivity when the '599 patent expires.  App. 50, Am. Compl. ¶ 33.

### 2.    Apotex's ANDA and This Lawsuit.

Years after Mylan opened the door to early generic competition, Apotex sought to piggyback on Mylan's success by filing its own ANDA referencing Benicar®.  Unlike Mylan's original submission, Apotex filed

a Paragraph IV certification *only* as to the '703 patent—which Mylan already had knocked out. App. 48-49, Am. Compl. ¶¶ 26-28. By contrast, Apotex filed a Paragraph III certification to the '599 patent, thereby conceding that that patent was valid, enforceable, and would be infringed by Apotex's product, and acknowledging that the '599 patent independently bars Apotex's market entry. *See* Blue Br. at 12-13 ("At present, Apotex is not challenging the '599 patent …, and has filed a Paragraph III certification with respect to that patent."). And because Apotex chose to sit on its hands while Mylan blazed the path, Apotex now concedes that its approval is blocked by not only the '599 patent, but by Mylan's exclusivity: "FDA will be prohibited from granting final approval to Apotex … until 180 days after Mylan [enters the] market." App. 50, Am. Compl. ¶ 33. To this date, Apotex's ANDA remains under review and is not approvable in its current form: The company has not yet received tentative approval from FDA for its ANDA.

This lawsuit represents Apotex's strategic attempt to evade the consequences of its own delay in challenging the listed patents: By seeking a declaratory judgment that it does not infringe the patent Mylan caused Daiichi to abandon, Apotex is trying to engineer a

17

forfeiture of Mylan's exclusivity under the "failure-to-market" forfeiture provision. Apotex's theory is that Mylan will forfeit exclusivity if it fails to begin selling its product within 75 days of a final decision in this litigation that "the '703 patent is invalid or not infringed," something Mylan may not be able to do because the '599 patent and related pediatric exclusivity bar Mylan from entering the market until October 2016. App. 50, Am. Compl. ¶¶ 33-34; *see also* App. 51-52, Am. Compl. ¶ 40 ("[A] declaratory judgment of noninfringement would trigger … Mylan's exclusivity period."). For that reason, Apotex's complaint seeks a declaratory judgment of non-infringement and a declaration that FDA "may approve Apotex's [ANDA for olmesartan] whenever that application is otherwise in condition for approval," *i.e.*, without respect to Mylan's 180-day exclusivity. App. 52, Am. Compl. at 10, Prayer ¶ C.

Given Apotex's attempt to engineer the forfeiture of Mylan's statutory right to 180-day marketing exclusivity, Mylan moved on April 9, 2013 to intervene and to dismiss Apotex's complaint for lack of subject-matter jurisdiction. App. 105-06 (motion to intervene), 157 (motion to dismiss). As Mylan explained, there are several jurisdictional barriers to Apotex's lawsuit, including the fact that

Apotex lacks the tentative approval necessary for the judgment it seeks to cause a forfeiture of Mylan's exclusivity. App. 160-79. Daiichi also moved to dismiss the same day. App. 77. Apotex opposed both motions to dismiss, *see* App. 190-208, but no party opposed Mylan's intervention. App. 182-83 (Daiichi), 186-87 (Apotex).

On January 9, 2014, the district court issued an opinion and order granting Daiichi's motion to dismiss for lack of subject-matter jurisdiction. App. 2-8. But it denied both of Mylan's motions in a single sentence lacking any supporting analysis: "Given this Court's ruling granting Daiichi's motion to dismiss, non-party Mylan's motions are moot." App. 8. The district court issued its final judgment that same day. App. 1.

Apotex appealed the dismissal of its complaint, *see* D. Ct. Dkt. No. 51, and Mylan timely cross-appealed from denial of its motions to intervene and dismiss, *see* D. Ct. Dkt. No. 57.

## SUMMARY OF ARGUMENT

The district court's single-sentence dismissal of Mylan's motion to intervene and motion to dismiss as "moot" must be reversed. On intervention, Mylan has an obvious right to participate in this case as a

full party. The avowed purpose of Apotex's lawsuit is to trigger a forfeiture of Mylan's statutory right to 180-day marketing exclusivity for generic Benicar® tablets, and the courts repeatedly have recognized that such exclusivity is a legally protectable interest giving rise to Article III standing. Given Apotex's appeal from the district court's decision—an appeal that seeks to reinstate its lawsuit and thereby engineer the forfeiture of Mylan's exclusivity—Mylan has just as powerful an interest in this case today as it did when the case was originally filed; that interest hardly evaporated simply because the parties' dispute moved to this Court, as everyone knew it would regardless of who prevailed in the district court. Nothing, in short, is "moot" about Mylan's need to intervene.

Mylan satisfies each of the remaining criteria for intervention as well: Its intervention motion was timely, no other party adequately represents Mylan's interests, and no other party would be unfairly prejudiced by Mylan's participation in this case. That's why neither Apotex nor Daiichi formally opposed Mylan's motion below. Intervention thus should have been granted.

The district court's denial of Mylan's motion to dismiss as "moot" fares no better. Because Apotex's appeal seeks to reinstate its lawsuit, Mylan's assertion that the courts lack jurisdiction over that lawsuit— like Mylan's intervention itself—remains as relevant as ever. The principal jurisdictional barrier here is that Apotex lacks standing. Its supposed injury—the company's inability to market its product at market formation—is no more attributable to Daiichi or Mylan than it is to the shortcomings in Apotex's own ANDA. After all, Apotex's ANDA lacks tentative approval, so Apotex could not come to market even if its lawsuit successfully engineers the forfeiture of Mylan's exclusivity. Apotex of course hopes that its file will be approvable when Mylan enters the market on patent expiry. But hope isn't a valid basis for Article III standing.

Apotex's lack of tentative approval bars jurisdiction for another reason: The judgment it seeks will not redress its purported injury. While Apotex claims that the requested judgment will cause Mylan to forfeit its exclusivity, in reality it will do nothing of the sort. Under the Hatch-Waxman Act's plain language, a subsequent ANDA filer like Apotex can trigger a forfeiture of the first-filer's exclusivity by bringing

a declaratory judgment **only** after it already "has received tentative approval." Even if Apotex succeeded in invalidating the '703 patent, it still would not gain any benefit given its lack of tentative approval. And were that not enough, the judgment Apotex seeks cannot affect Mylan's right to exclusivity in any event, because it is well settled that a brand manufacturer cannot manipulate a first-filer's exclusivity right by abandoning a challenged patent. Suffice it to say, if the brand cannot engineer a forfeiture by abandoning its patent, a contrived judgment saying that the brand manufacturer abandoned its patent cannot do so either.

## STANDARDS OF REVIEW

This Court applies the standard of review of the relevant regional circuit in appeals from both denials of intervention and dismissals for lack of subject-matter jurisdiction. *Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1328 (Fed. Cir. 2010) ("We review the district court's denial of intervention under Rule 24 under regional circuit law."); *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1380-81 (Fed. Cir. 2002) ("We review a dismissal for lack of subject matter jurisdiction according to regional circuit law.").

The Seventh Circuit reviews the denial of a motion to intervene as of right on grounds other than untimeliness *de novo*. *Sokaogon Chippewa Comm. v. Babbitt*, 214 F.3d 941, 945 (7th Cir. 2000) (citing *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 175 (7th Cir. 1995) ("We review the timeliness decision for abuse of discretion, while the other factors are reviewed *de novo*.") (citation omitted)). And it reviews the dismissal of a complaint for lack of subject-matter jurisdiction *de novo* as well. *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014) (citing *Hager v. City of W. Peoria*, 84 F.3d 865, 868 (7th Cir. 1996) & *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1158 (7th Cir. 1994)).

This Court can of course affirm for any reason supported by the record. *See, e.g.*, *Quincy Mall, Inc. v. Parisian, Inc.*, 27 Fed. App'x 631, 636 (7th Cir. 2001) (holding that "[w]e may affirm a district court based on any reason adequately supported by the record") (citing *Anderson v. Chrysler Corp.*, 99 F.3d 846, 855 n.5 (7th Cir. 1995) ("We have stated many times our authority to affirm a district court's decision for any reason adequately supported by the record.") (citations omitted); *Shamrock Tech. v. Medical Sterilization, Inc.*, 903 F.2d 789, 792 (Fed.

Cir. 1990) (same); *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549,
1556 (Fed. Cir. 1985) (explaining that this Court reviews judgments,
not opinions).

Finally, all federal courts are "required to consider subject-matter
jurisdiction as the first question in every case, and … must dismiss this
suit if such jurisdiction is lacking." *Aljabri v. Holder*, 745 F.3d 816, 818
(7th Cir. 2014) (citing, *inter alia*, *Illinois v. City of Chicago*, 137 F.3d
474, 478 (7th Cir. 1998)); *United States v. Lawrence*, 535 F.3d 631, 636
(7th Cir. 2008) (explaining that "the district court's subject-matter
jurisdiction is always properly before [the Court] and cannot be waived
by a party," because "[s]ubject-matter jurisdiction is 'the courts'
statutory or constitutional ***power*** to adjudicate the case.'" (emphasis in
original) (citing, *inter alia*, *Steel Co. v. Citizens for Better Env't*, 523 U.S.
83, 89 (1998)).  Indeed, "[i]t is [the Court's] obligation … to address the
issue [of subject-matter jurisdiction] independently." *Aljabri*, 745 F.3d
at 818; *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 544 (7th Cir.
2008) (explaining that where an "argument thus concerns this court's
subject matter jurisdiction … [w]e are obliged to consider that at any
point in the litigation") (citation omitted).

# ARGUMENT

## I. The District Court Erred In Denying Mylan's Motion To Intervene As "Moot."

The district court did not dispute that Mylan satisfies each of the criteria for intervention as a matter of right. As Rule 24(a)(2) provides:

> On timely motion, the court must permit anyone to intervene who: … (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2); *see also People Who Care*, 68 F.3d at 175 ("'[A] proposed intervenor] must (1) make timely application, (2) have an interest relating to the subject matter of the action, (3) be at risk that that interest will be impaired, as a practical matter, by the action's disposition and (4) lack adequate representation of the interest by the existing parties.'") (quoting *Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 438 (7th Cir. 1994)). Mylan easily satisfies these standards and should have permitted to intervene.

**A. Mylan Has A Legally Protectable Interest That Apotex's Lawsuit Is Deliberately Intended To Destroy.**

**1. The Sole Purpose Of This Litigation Is To Impair Mylan's Statutory Right To 180-Day Exclusivity.**

Mylan has a powerful interest in preventing the impairment of its statutory right to 180-day marketing exclusivity—a right that Apotex concedes Mylan earned by challenging the '703 patent before any other applicant. App. 50, Am. Compl. ¶ 33. Indeed, the courts repeatedly have recognized that 180-day exclusivity is a "legally protected interest," *see, e.g.*, *Mylan*, 789 F. Supp. 2d at 8, that gives rise to standing when threatened. *Teva v. Sebelius*, 595 F.3d at 1312 ("Teva faces an imminent threat of the same harm that has sufficed for Article-III injury purposes in all of our past drug-approval cases: the impending prospect of allegedly unlawful competition in the relevant market.").

Exclusivity-entitled generic applicants thus are permitted to intervene as of right—and as a matter of course—when a third party's lawsuit takes aim at their exclusivity right. *See, e.g.*, *Apotex, Inc. v. FDA*, No. 06-0627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) ("Intervenor-defendants … stand to lose a statutory entitlement, which is a harm that has been recognized as sufficiently irreparable [to warrant injunctive relief].") (citation omitted); *see also Sandoz, Inc. v.*

26

*FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) ("[The requested relief] would deprive [intervenor-defendant] of the exclusivity to which it is entitled and millions of dollars.").

That principle controls here. Again, the avowed purpose of Apotex's lawsuit is to engineer the forfeiture of Mylan's 180-day marketing exclusivity in the hope (misguided, as it happens, *see infra* at 37-42) that Apotex thereby can enter the market unblocked by Mylan's right to exclusivity:

> Mylan retains a 180-day first generic applicant exclusivity by virtue of [its] Paragraph IV certification against the '703 patent. As such, the FDA will be prohibited from granting final approval to Apotex … unless … a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the '703 patent is invalid or not infringed. 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA). As such, unless the Court first declares the '703 patent invalid, unenforceable or not infringed by Apotex's ANDA Product, Apotex will be prohibited from selling its product until 180 days after Mylan chooses to market its [product].

App. 50, Am. Compl. ¶ 33; *see also* Blue Br. at 15, 19.

Indeed, Apotex's complaint left no doubt that it seeks the entry of a declaratory judgment of non-infringement so as to "trigger first applicant Mylan's exclusivity period, which otherwise will block final FDA marketing approval of Apotex's ANDA." App. 51-52, Am. Compl.

¶ 40.   And it further sought the entry of an order "[d]eclaring that [FDA] may approve Apotex's [product] whenever that application is otherwise in condition for approval," without respect to Mylan's right to 180-day exclusivity.  App. 52, Am. Compl. at 10, Prayer ¶ C.  Given that Apotex's lawsuit takes direct aim at Mylan's exclusivity, Mylan should have been permitted to intervene to prevent the threatened (indeed, intended) impairment of its statutory right to 180-day exclusivity.

## 2.    Mylan's Interest Is Not Moot.

The district court nonetheless held that its decision to grant Daiichi's motion to dismiss somehow meant that "non-party Mylan's motions are moot."  App. 8.  That ruling fundamentally misunderstands mootness: "[A] suit becomes moot … when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (some internal quotation marks omitted); *Powell v. McCormack*, 395 U.S. 486, 496 (1969) (same).  That means that "a case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  *Chafin*, 133 S. Ct. at 1023 (quoting *Knox v. Service*

*Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012))
(citation and internal quotation marks omitted); *Church of Scientology
of Cal. v. United States*, 506 U.S. 9, 12 (1992) (same); *Killian v. Concert
Health Plan*, 742 F.3d 651, 660 (7th Cir. 2013) (*en banc*) (same); *Flynn
v. Sandahl*, 58 F.3d 283, 287 (7th Cir. 1995) (same).  "As long as the
parties have a concrete interest, however small, in the outcome of the
litigation, the case is not moot."  *Knox*, 132 S. Ct. at 2287 (internal
quotation marks and brackets omitted).  Applying this well-established
standard here, it is impossible to say that Mylan no longer has "a
concrete interest, however small, in the outcome of th[is] litigation."  *Id.*

     The reason is simple: At the time the district court declared
Mylan's motions "moot," Apotex retained the right to appeal that
decision to this Court and thereby maintain its threat to Mylan's
exclusivity.  *See* Fed. R. App. P. 4.  And Apotex in fact appealed the
district court's dismissal of its lawsuit—as everyone knew it would—
which in fact maintained Apotex's ongoing threat to Mylan's statutory
right to exclusivity.  Mylan thus has the same "concrete interest" in
protecting its exclusivity today as it did the day this case was filed.  The
only thing that has changed is the forum in which Mylan's interest is

under assault: Whereas Apotex initially filed suit and sought to stave off dismissal in the district court, it now asserts that this Court should reverse that dismissal and let its claims proceed on the merits—where ongoing litigation would threaten to impair the very interest that prompted Mylan to seek intervention in the first place.

Given Apotex's pending appeal, any claim that Mylan's interest has become moot is frivolous. Indeed, it defies both law and logic to suggest that a proposed intervenor can have a judicially-recognized and unobjected-to interest entitling it to participate as a full party while in the district court, but that its interest magically disappears and becomes forever moot (a) if the district court inexplicably holds the proposed intervenor's motion in abeyance until it enters judgment and (b) even if the party threatening the would-be intervenor's interest can and does appeal from that judgment, thereby preserving the threat which prompted the proposed intervention. After all, intervenors are entitled to participate in a case through all subsequent proceedings, including on appeal—and that possibility was both in play the day the district court rendered its mootness decision and judgment, and then was realized when Apotex timely appealed from that judgment. *See,*

*e.g.*, *Lake Investors Dev. Grp., Inc. v. Egidi Dev. Grp.*, 715 F.2d 1256, 1260 (7th Cir. 1983) (holding intervention proper where adverse decision "would … foreclose rights of the proposed intervenor in a subsequent proceeding"); *cf. Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (innovator "entitled to intervene as of right" and "a proper party to the appeal … and in all further proceedings in the district court" because subsequent generic applicant's lawsuit threatened to undermine first generic's exclusivity and thereby expose innovator to additional, allegedly unlawful competition).

In short, Mylan's interest in protecting its statutory right to 180 days of marketing exclusivity from Apotex's assault is no less "live" today than it was when this case began. And precisely because Mylan should have been allowed to intervene as a full party-defendant, it has every right to be heard here—not least of all given the nature of the arguments Mylan is raising, which address subject-matter jurisdiction and thus must be considered by this Court regardless of whether a party to the litigation opts to assert them. *See, e.g.*, *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967-68 (7th Cir. 2013) ("We are obliged to inquire into the existence of federal jurisdiction whenever any

concerns arise.") (citing *Tylka v. Gerber Prods. Co.*, 211 F.3d 445, 447 (7th Cir. 2000)).

## B. Mylan Meets The Remaining Criteria For Intervention As Of Right.

No party formally opposed Mylan's intervention in the district court, and the district court itself did not offer any substantive basis for denying Mylan's intervention (whether as of right or permissively).[2] Other than the asserted mootness of Mylan's intervention, there is thus no basis for this Court to affirm the district court's denial of Mylan's

---

[2] In response to Mylan's motion to intervene, Apotex briefly claimed that Mylan has "no protectable interest in this case that justifies its intervention," but nonetheless took "no position with respect to Mylan's intervention." App. 186-87 (response to motion to intervene); *see also* App. 313 (oral argument transcript). Daiichi argued that Mylan's motion further supported dismissal, but claimed without analysis that "Mylan's motion is moot if the Court grants [Daichii's] motion." *See* App. 182-83 (response to motions to intervene and to dismiss); *see also* App. 314 (oral argument transcript). To the extent either Apotex or Daiichi seeks to offer actual arguments in opposition to Mylan's right to intervene before this Court, any such arguments would be waived. *See, e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule that arguments not raised to the district court are waived on appeal.") (citations omitted); *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("We have long held that issues that a claimant fails to raise before the district court are waived on appeal.") (citations, internal quotation marks, and brackets omitted).

motion to intervene. For the avoidance of doubt, however, we briefly address the other intervention factors here.

### 1. Mylan's Intervention Was Timely.

As the Seventh Circuit has explained, "[t]he timeliness factor is essentially a reasonableness inquiry," *People Who Care*, 68 F.3d at 175 (citing *Nissei Sangyo Am.*, 31 F.3d at 438), with courts assessing "(1) [t]he length of time the intervenor knew or should have known of his interest in the case, (2) the prejudice to the original parties caused by the delay, (3) the resulting prejudice to the intervenor if the motion is denied, and (4) any unusual circumstances," *Shea v. Angulo*, 19 F.3d 343, 349 (7th Cir. 1994)).

There is no question that Mylan's intervention was timely, which is why no party even hinted otherwise below. Apotex filed its amended complaint on February 12, 2013, and Mylan's counsel promptly notified counsel for both Daiichi and Apotex that Mylan intended to intervene in accordance with the deadlines set for Daiichi to answer or otherwise respond to the amended complaint. At the time Mylan sought intervention, no discovery had occurred; no substantive pleadings had been filed; the district court had taken no substantive action with

respect to this litigation; and, other than the deadline for the filing of Daiichi's answer or motion to dismiss (a deadline with which Mylan complied by filing its own motion to dismiss on that date), no proceedings were scheduled to take place. Mylan's motion for intervention clearly was timely. *See Nissei Sangyo Am.,* 31 F.3d at 439.

### 2. No Party Adequately Represents Mylan's Interests.

Nor do any of the original parties to this lawsuit adequately represent Mylan's interests. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) ("[This] requirement … is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal."); *Lake Investors,* 715 F.2d at 1261 (same). Apotex obviously doesn't represent Mylan's interests; indeed, it seeks to trigger a forfeiture of Mylan's exclusivity.

Daiichi doesn't either: After all, Mylan and Daiichi are direct competitors and litigation adversaries, the latter having fought for years to keep Mylan off the market. *See Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346 (Fed. Cir. 2010). Needless to say, competitors cannot rely on each other to defend their respective

interests. *See, e.g., Mova Pharm.*, 140 F.3d at 1076 (recognizing that brand and generic manufacturers do not protect each other's interests); *see also Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003) (explaining that "even a shared general agreement does not necessarily ensure agreement in all particular respects, and the tactical similarity of the present legal contentions of the parties does not assure adequacy of representation or necessarily preclude the intervenor from the opportunity to appear in its own behalf") (citation, internal quotation marks, ellipses, and alterations omitted); *Lake Investors*, 715 F.2d at 1261 (even though plaintiff and proposed intervenor "have the same ultimate objective," plaintiff could not adequately represent proposed intervenor because they were "directly in competition").

As a result, there is no question that Mylan satisfied all criteria for intervention and should have been permitted to intervene.

## C.  At Minimum, Mylan Should Have Been Allowed To Intervene Permissively.

Even if this Court were to conclude that Mylan somehow does not satisfy the prerequisites for intervention as of right, reversal still is warranted because the district court at minimum should have allowed Mylan permission to intervene.  As Fed. R. Civ. P. 24(b)(1)(B) explains,

"[o]n timely motion, the court may permit anyone to intervene who …
has a claim or defense that shares with the main action a common
question of law or fact."  That test is easily met here:  Mylan not only
has a significant interest in the outcome of this case, but its defenses
address the same legal and factual issues implicated by Apotex's
complaint and appeal.   Nor can any party show prejudice from Mylan's
intervention: To repeat, neither Apotex nor Daiichi formally opposed
Mylan's intervention below, and Mylan is raising the same arguments it
made below.  At minimum, then, permissive intervention should have
been granted.

## II.   This Court Should Affirm The Dismissal Of Apotex's Lawsuit.

As Mylan explained in the district court, Apotex lacks standing to
bring this lawsuit.  A party claiming it has standing must establish that
"(1) it has suffered an 'injury in fact' that is (a) concrete and
particularized and (b) actual or imminent, not conjectural or
hypothetical; (2) the injury is fairly traceable to the challenged action of
the defendant; and (3) it is likely, as opposed to merely speculative, that
the injury will be redressed by a favorable decision."  *Friends of the
Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co.*, 523 U.S. 103-04. Apotex flunks this test at every turn.

**A.   The District Court Erred In Denying Mylan's Motion To Dismiss As Moot.**

Though the district court ultimately reached the right result—by dismissing Apotex's complaint for lack of subject-matter jurisdiction— it erred in dismissing Mylan's motion to dismiss as "moot" for the same reason it erred in dismissing Mylan's motion to intervene as "moot." App. 8. The fact that Daiichi's motion to dismiss was granted does not mean that Mylan no longer had an interest in dismissal or that Mylan now lacks an interest in this case: Again, Apotex retained the right to appeal the district court's dismissal of its lawsuit and in fact filed such an appeal—meaning that the court's subject-matter jurisdiction remains in play. Yet by denying Mylan's motion to intervene, the district court improperly and without justification deprived Mylan of its opportunity to participate in the litigation as a full party, leaving its cross-appeal as the only vehicle for preserving the company's ongoing

37

interest in the outcome of Apotex's lawsuit. This Court thus should not only reverse the denial of intervention, but must allow Mylan to participate on appeal as though its intervention had been granted.

### B. Apotex's Alleged Injury Is Insufficient To Ground Article III Standing.

To confer standing, a plaintiff's asserted injury-in-fact "must be concrete in both a qualitative and temporal sense," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), meaning that it must be a "'distinct and palpable'" injury that is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983); *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013) ("[Plaintiffs'] theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'") (citing *Whitmore*, 495 U.S. at 158) (emphasis in original).

Apotex does not remotely meet that standard. Instead, its asserted injury is that Mylan's statutory right to 180-day marketing exclusivity *might* exclude Apotex from the market "upon the expiration of the '599 patent and … pediatric exclusivity." App. 49-50, Am. Compl. ¶¶ 30, 33; Blue Br. at 15 ("Unless Apotex can obtain a final court

38

decision that the '703 patent is invalid or not infringed it will delay generic competition by preventing Apotex from obtaining final FDA approval."); *id.* at 19 ("Apotex still needs a court judgment of noninfringement or invalidity to obtain final marketing approval and enter the market as soon as the '599 patent expires.").

But as things stand today, Apotex would be barred from entering the market upon the expiration of the '599 patent ***regardless*** of Mylan's statutory right to marketing exclusivity, so it is entirely speculative whether Mylan's exclusivity will have any impact on Apotex's ability to enter the market (assuming *arguendo* that the ordinary operation of the statutory scheme could constitute a legally cognizable injury in any event, *but see, e.g.*, *infra* at 45-51). After all, as Apotex conceded below, FDA has not even granted Apotex's ANDA a tentative approval, *see* App. 204—which means that deficiencies in Apotex's ANDA render it unsuitable for approval in its current form. ***As a result, Apotex can only speculate whether its ANDA will be approvable before Mylan's exclusivity ends or, indeed, ever***. And so long as Apotex lacks tentative approval, this lawsuit is pointless: Even if this lawsuit were to eliminate Mylan's exclusivity (assuming

39

*arguendo* that it could, *but see, e.g., infra* at 40-42), Apotex's launch would not be accelerated by a single day. Apotex itself obliquely concedes the point: "[I]f a Court first declares the '703 patent unenforceable or not infringed by Apotex's ANDA Product, **this obstacle** [Mylan's exclusivity] to Apotex's FDA approval will be removed." Blue Br. at 14 (emphasis added). But other obstacles— including Apotex's failure to perfect its ANDA—remain as independent barriers to the company's launch, and thus render it wholly speculative whether Mylan's exclusivity will have any impact on the timing of Apotex's launch.

The fact that Apotex's theory of standing depends "on speculation about the decisions of independent actors" (here, FDA) is particularly significant. *Clapper*, 133 S. Ct. at 1150. At best, Apotex's argument boils down to the the proposition that it **might be** injured by Mylan's exclusivity (1) **if** FDA completes review of Apotex's ANDA before Mylan's exclusivity ends; (2) **if** FDA finds no deficiencies in the ANDA; and (3) **if** FDA grants tentative approval. But as the courts have repeatedly explained, that sort of hypothetical chain of events is not sufficient to confer standing. *Id*. at 1148 ("[Plaintiffs'] theory of

standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that the threatened injury must be certainly impending.") (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) & *Whitmore*, 495 U.S. at 157-60); *Northwest Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) ("The injury requirement will not be satisfied simply because a chain of events can be hypothesized in which the action challenged eventually leads to actual injury."); *see also Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 580-82 (1981) (barring claims that depend on speculation about how a federal agency would act). Put simply, Apotex has no idea when (or whether) FDA will deem its ANDA eligible for approval, and thus cannot credibly assert that Mylan's statutory right to 180-day exclusivity will impact Apotex's ability to market its products. Its asserted injury is thus purely hypothetical.

That is why courts routinely reject claims brought by late-filing generic applicants on precisely this ground, *see, e.g., Mylan*, 789 F. Supp. 2d at 7 (dismissing case because plaintiffs "still have not received even tentative approval for their ANDA—a key factor in standing analysis"), including in prior cases brought by Apotex:

> Apotex asserts that its ANDAs are under review by the FDA and it expects to receive final approval to begin marketing on April 6, 2010. Apotex's expectation of final approval depends on the FDA's completion of scientific review of Apotex's ANDAs and finding no deficiencies in the ANDAs. The interest that Apotex alleges in this suit—its desire to market generic losartan in the future—presumes final approval of its ANDAs and is speculative.

*Teva Pharms. USA, Inc. v. Sebelius*, 638 F. Supp. 2d 42, 58 (D.D.C. 2009), *vacated on other grounds* 595 F.3d 1303 (D.C. Cir. 2010).[3]

At bottom, Apotex's alleged injury is too speculative to ground standing and the complaint should have been dismissed for this reason.

## C. This Lawsuit Cannot Redress Apotex's Alleged Injury In Any Event.

Apotex likewise lacks standing because it has not shown that its asserted "injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted). "Absent such a showing, exercise of [the judicial] power by a federal court would be gratuitous." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). Apotex's complaint

---

[3] It equally could be said that Apotex's claims are not ripe. *See, e.g.*, *Mylan*, 789 F. Supp. 2d at 11 ("Continued uncertainty … remains as to if and when [Apotex's] ANDA will be ready for approval, be it tentative or final."); *see also Pfizer Inc. v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) ("The critical fact remains that the FDA may never approve [the ANDA], [so] review now may turn out to have been unnecessary.") (citation and quotation marks omitted).

asserted that its alleged injury "can be redressed [because] a declaratory judgment of noninfringement would trigger … Mylan's exclusivity." *See* App. 51-52, Am. Compl. ¶ 40; *see also* Blue Br. at 24. That claim is doubly flawed.

***First***, the statute provides for forfeiture only if the final court decision of noninfringement or invalidity is entered "in a declaratory judgment action ***brought by [another] applicant … which other applicant has received tentative approval***." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA) (emphasis added). That necessarily means that the "other applicant" seeking such a decision—here, Apotex—must already "ha[ve] received tentative approval" when the "declaratory judgment action [was] brought by that applicant" in order for the decision to trigger forfeiture. *See, e.g.*, *Barrett v. United States*, 423 U.S. 212, 216 (1976) ("[T]he present perfect tense[] denot[es] an act that has been completed."). That is dispositive here: Apotex to this day lacks tentative approval, so the requested judgment cannot affect Mylan's exclusivity under the statute's plain language.[4]

---

[4]    At the very least, the statute requires the applicant to have obtained tentative approval prior to the entry of the requested

(Continued…)

**Second**, the requested judgment still would not redress Apotex's asserted injury even if that obstacle could be overcome. As Apotex admits, *see* Blue Br. 23, the Hatch-Waxman Act does not allow "the brand maker [to] unilaterally deprive the generic of its exclusivity" by abandoning a challenged patent. *Teva v. Sebelius*, 595 F.3d at 1316-18. There is thus no dispute that Daiichi's disclaimer of the '703 patent and attendant failure to pay maintenance fees cannot trigger the forfeiture of Mylan's statutory right to 180-day generic marketing exclusivity on their own. *Apotex*, 384 Fed. App'x at 4 ("Congress could not have intended a brand manufacturer's unilateral decision to cause the premature expiration of a patent … to strip the first generic applicant of … exclusivity.") (citing *Teva v. Sebelius*, 595 F.3d at 1317-18).

But despite that well-established precedent—which Apotex does not challenge here, *see* Blue Br. at 23 (describing *Teva v. Sebelius* as "settled law")—Daiichi's abandonment of the '703 patent in response to Mylan's pathbreaking Paragraph IV challenge is the **only** basis Apotex

_____

judgment. Yet even in that circumstance, Apotex can only speculate about when it will receive such tentative approval (if ever) and the redressability of its asserted injury thus remains entirely speculative.

44

cites as supporting its requested judgment of noninfringement.   App. 51, Am. Compl. ¶ 37 ("Because the '703 patent has expired for failure to pay maintenance fees and every claim was disclaimed, [Apotex's ANDA product] will not [infringe] … the '703 patent.").   But if "Congress could not have intended" Daiichi's actions to cause a forfeiture in their own right, *Apotex*, 384 Fed. App'x at 4, it could not have intended a contrived judicial decision stating that Daiichi undertook those same actions to cause a forfeiture.   Apotex may not like the *Teva* and *Apotex* decisions— indeed, it tried without success to appeal them to the Supreme Court, *Apotex, Inc. v. Sebelius*, 131 S. Ct. 1000 (2011)—but they foreclose Apotex's attempt to evade the intended result of Hatch-Waxman's incentive structure by depriving Mylan of its statutory reward for having opened the market to generic competition some five-and-a-half years before the '703 patent otherwise would have allowed.

### D.   Apotex's Alternative Arguments For Subject-Matter Jurisdiction Are Meritless.

It is no surprise that Apotex's opening brief ignores these glaring deficiencies in its standing.   Instead, it claims this case is controlled by *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278 (Fed. Cir. 2008), and that the district court's jurisdiction is further supported by

45

this Court's now-vacated decision in *Teva Pharms. USA, Inc. v. Eisai Co.*, 620 F.3d 1341, 1348 (Fed. Cir. 2010), *vacated with instructions to dismiss as moot* 131 S. Ct. 2991 (2011). *See* Blue Br. at 18-22, 26-28.

We acknowledge that both of those cases allowed declaratory judgment actions brought by subsequent applicants like Apotex to proceed. But neither of those cases involved a claim brought by a dilatory applicant whose ANDA lacked even a tentative approval, so neither had occasion to consider (much less address) the jurisdictional consequences of a declaratory plaintiff's failure to secure such a tentative approval. As a result, Apotex's effort to squeeze itself into those cases has no bearing on the analysis set forth above. And those cases are distinguishable on their own terms, in part for the reasons this Court recognized in *Janssen Pharmaceutica, N.V. v. Apotex, Inc.*, 540 F.3d 1353 (Fed. Cir. 2008), and in part for reasons this Court has not yet recognized.

### 1. This Court's Decision In *Janssen* Is Directly On Point And Forecloses Jurisdiction.

Apotex's central claim is that the district court had jurisdiction to adjudicate this case under this Court's decision in *Caraco*. Blue Br. at 25-28. But *Caraco* is distinguishable from this case for the very reason

46

this Court recognized in *Janssen*: Whereas the generic manufacturer-plaintiff in *Caraco* had filed Paragraph IV certifications challenging ***all*** of the patents that the innovator-defendant had listed in FDA's Orange Book, the late-filing generic plaintiff in *Janssen* (as here, Apotex) instead had conceded the validity and infringement of one of the listed patents. That foreclosed jurisdiction over Apotex's lawsuit against innovator-defendant Janssen because Apotex's concession of validity and infringement created an independent barrier to its market entry that had nothing to do with the innovator's original patent listing:

> [U]nlike Caraco, Apotex … stipulated to the validity of the '663 patent. Even if Apotex successfully invalidates the [other] patents, it cannot obtain FDA approval until the expiration of the '663 patent because of its stipulations with respect to that patent. Instead, the harm to Apotex … is its exclusion from … the market by [the first applicant]'s 180-day exclusivity period—a period which [the first applicant] is entitled to under the Hatch-Waxman Act. This is a different injury than in *Caraco* [and] … is not a cognizable Article III controversy.

*Janssen*, 540 F.3d at 1361.

That is exactly what happened here. As when it stipulated to the validity and infringement of one of the patents in *Janssen*, Apotex failed to challenge all of the listed patents here: Apotex openly acknowledges that its olmesartan ANDA included a Paragraph III certification to the

47

'599 patent, App. 48, Am. Compl. ¶ 27; *see also* Blue Br. at 12-13, and the filing of a Paragraph III certification is indistinguishable from a stipulation that the relevant patent is valid and will be infringed by the proposed ANDA product—as *Janssen* itself recognized.   540 F.3d at 1358 ("In filing its ANDA, Teva respected the validity of the '663 patent by filing a Paragraph III Certification."); *see also Mova Pharm.*, 140 F.3d at 1065 ("Mylan's initial filing contained a paragraph III certification; this meant that Mylan conceded patent infringement, so that its ANDA could not receive FDA approval until [the] patent expired."); *Apotex Inc. v. Eisai Inc.*, No. 1:09-cv-477, 2010 WL 3420470, *11 n.4 (M.D.N.C. Aug. 27, 2010) ("[F]iling a Paragraph III certification to a patent is done for the purposes of declaring, and serves as recognition of the fact, that the patent is valid and enforceable."). Indeed, a Paragraph III certification has exactly the same effect as a stipulation of validity and infringement: It is a representation that the ANDA applicant will stay off the market until that patent expires.  *See* Blue Br. at 19 ("Apotex … needs a court judgment of noninfringement or invalidity to obtain final FDA marketing approval and enter the

market **as soon as the '599 patent expires** [but not before].")
(emphasis added).

There thus is no daylight between this case and *Janssen*: As there,
Apotex here has erected an independent barrier to its market entry that
has nothing to do with Daiichi's listing of the '703 patent. And because
Apotex's own certification strategy is keeping it off the market, this case
should be dismissed for the same reason Apotex's strategy required
dismissal of the declaratory judgment action it filed in *Janssen*.

Apotex's only response is that *Janssen* is irrelevant because it
predated the MMA amendments to the Hatch-Waxman Act. Blue Br. at
29. Accordingly to Apotex, those amendments somehow excuse the
company from the consequences of its certification strategy because
they supposedly "incentivize a subsequent ANDA filer like Apotex to file
its own challenge to the '703 patent, which if successful, will cause
competition from multiple generics on day 1 after the '599 patent
expires." Blue Br. at 24. This is "precisely the outcome that the MMA
Amendments were intended to create," Apotex claims, particularly
where a "first filer failed in its patent challenge and is unable to get its
product to market fast." *Id*. That argument is wrong on multiple

49

levels, as this Court previously recognized. *Dey Pharma, LP v. Sunovion Pharms. Inc.*, 677 F.3d 1158, 1160 (Fed. Cir. 2012) ("Th[e MMA's] change in the statutory trigger makes no difference.").

**First**, the notion that Mylan "failed in its patent challenge" is disingenuous at best. While it is true that Mylan's challenge **to the '599 patent** was unsuccessful (which in turn is why Apotex did not even try to challenge that patent when it filed its own ANDA years later), Mylan did succeed in challenging **the '703 patent**: Its Paragraph IV certification caused Daiichi to abandon that patent, and Mylan's remarkable success ensures that generic competition now can begin **more than five years** before the '703 patent otherwise would have allowed. After waiting for years to piggyback on Mylan's success, it comes with ill grace for Apotex to suggest that Mylan did not succeed by having accomplished precisely what Hatch-Waxman's 180-day exclusivity period rewards.

**Second**, Apotex overlooks the true import of the MMA for this case. Even if everything Apotex says about the MMA were true (it isn't, as set forth below), the company's failure to secure tentative approval precludes it from taking advantage of the very MMA provision it now

invokes. Again, because Apotex lacks the tentative approval Congress required, the non-infringement judgment it seeks would not trigger the forfeiture of Mylan's exclusivity. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb). Given the statute's plain language, Apotex's assertion that Congress somehow intended to benefit dilatory applicants like Apotex is astonishing; the fact that Congress expressly limited the MMA's triggering mechanism to applicants that already "ha[ve] obtained tentative approval" shows that Congress plainly did not intend to benefit applicants like Apotex whose ANDAs are not ready for approval.

***Third***, Apotex fundamentally misconstrues the MMA's amendments in any event. Though Apotex claims that the MMA was intended to "incentivize" lawsuits like this one by "expressly creat[ing] a mechanism for subsequent ANDA filers to challenge non-asserted Orange Book patents," Blue Br. at 24, 30, the same mechanism Apotex invokes here long predated the MMA. Even the unamended statute expressly permitted ANDA applicants to trigger the first-filer's exclusivity by bringing declaratory judgment actions under the Declaratory Judgment Act, 28 U.S.C. § 2201(a). That, after all, is what generated the lion's share of the precedents in this area (including the

51

key cases upon which Apotex relies, *see* Blue Br. at 24-25, 26-28, 29, 31 (citing, *inter alia*, *Eisai*, *Janssen*, and *Caraco*)).

In an effort to blunt the force of that fact, Apotex suggests that the MMA somehow made these lawsuits easier to pursue. Not so. While Apotex asserts that the MMA now allows subsequent applicants to file declaratory judgment actions after 45 days elapse from the applicant's Paragraph IV notice, *id*. at 9, 28, the prior statute also included a 45-day proviso. *See* 21 U.S.C. § 355(j)(5)(B)(iii)(III) (pre-MMA version) ("Until the expiration of forty-five days from the date the notice [of a Paragraph IV certification] is received, no action may be brought … for a declaratory judgment with respect to the patent.").

So what did the MMA do? Rather than facilitate the filing of such actions, the MMA's "new" declaratory judgment provision actually imposed new limits on such actions. Unlike the pre-MMA statute, which authorized subsequent applicants to file declaratory judgment actions after 45 days—***full stop***, the MMA now provides that such actions may be brought ***only*** when the brand manufacturer ***also*** fails to initiate a patent infringement suit against the ANDA applicant within 45 days of receiving the applicant's Paragraph IV certification. 21

U.S.C. § 355(j)(5)(C)(i)(I)(aa)-(cc) (post-MMA version). It thus is remarkable for Apotex to suggest that the amended statute—with its new tentative approval requirement for triggering the first-filer's exclusivity *and* its new limitation on the filing of these lawsuits— somehow facilitates the filing of these lawsuits and thereby abrogates *Janssen*'s analysis of the constitutional prerequisites to Article III jurisdiction.

At bottom, this case is on all fours with *Janssen* and is distinguishable from both *Caraco* and *Eisai* for the very reasons *Janssen* recognized when it dismissed Apotex's last attempt to misuse the statute's declaratory judgment mechanism.

### 2. Regional Circuit Law Forecloses Jurisdiction Here.

Even if this Court were to conclude that the MMA abrogates *Janssen*'s distinction of *Caraco* and *Dey*, Apotex's lawsuit still should be dismissed because regional circuit law forecloses subject-matter jurisdiction over this case. To this point, our discussion in Section II.D has presumed that *Caraco*, *Dey*, and *Janssen* supply the governing framework for assessing Article III jurisdiction in this declaratory-judgment case, since that always seems to have been this Court's

assumption in these kinds of cases and since the panel presumably would consider itself bound by those decisions. But there is good reason to question that assumption. After all, "[i]n issues that are not unique to patent law, [this Court] appl[ies] the law of the appropriate regional circuit … even if arising in the context of a patent infringement suit." *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999); *Sun Studs, Inc. v. Applied Theory Assocs., Inc.*, 772 F.2d 1557, 1561 (Fed. Cir. 1985) (instructing district courts "to follow the guidance of their regional circuits in all but the substantive law fields assigned exclusively to this court").

Needless to say, the prerequisites to jurisdiction under Article III's case-or-controversy requirement are neither "unique to patent law," *Novamedix*, 166 F.3d at 1180, nor one of the "substantive law fields assigned exclusively to [the Federal Circuit]." *Sun Studs*, 772 F.2d at 1561. They are ***constitutional matters*** that courts all over the country and at every level—including the regional circuit courts of appeal—must determine every time they wield the judicial power.

It is unclear why this Court has never addressed this choice-of-law question expressly, though one explanation may be that the answer

54

never previously mattered.  Take *Caraco*'s holdings regarding Article III causation and traceability.  The innovator-defendant in that case had argued that the generic-plaintiff's asserted injury—its exclusion from the market by virtue of the first-filer's statutory right to exclusivity—could not fairly be traced to the innovator's initial listing of the challenged patents in the Orange Book because the asserted injury materialized only (a) because the plaintiff chose to sit on its hands (b) while other parties independently chose to challenge the listed patents first.  This Court rejected that claim:

> It is not the Hatch–Waxman Act or the FDA framework that prevents Caraco's ANDA from being approved by the FDA, but rather Forest's actions in the context … of the Hatch–Waxman framework.  Simply put, if Forest had not listed its … patents in the FDA's Orange Book…, then [Hatch-Waxman's exclusivity provision] would not independently delay Caraco's ANDA from being approved by the FDA.  Such but-for causation is sufficient to satisfy the traceability requirement of Article III standing.

*See Caraco*, 527 F.3d at 1292.  Apotex reiterates that assertion here. Blue Br. at 26-27 (quoting *Caraco*).

We respectfully submit that *Caraco* incorrectly resolved that question.  *See, e.g.*, *Clapper*, 133 S. Ct. at 1152 (holding that "self-inflicted injuries are ***not*** fairly traceable to the [defendants'] purported

activities") (citations omitted; emphasis added); *Simon*, 426 U.S. at 41-42 ("[A] federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, ***and not*** injury that results from the independent action of some third party.") (emphasis added); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) ("***No*** [***party***] ***can be heard to complain*** about damage inflicted by its own hand.") (emphasis added). But the key point here is that *Caraco* originated from within the Sixth Circuit, and this Court's decision at least faithfully reflected the Sixth Circuit's view that mere but-for causation is sufficient to show traceability. *Nader v. Blackwell*, 545 F.3d 459, 472 (6th Cir. 2008); *Brunet v. City of Columbus*, 1 F.3d 390, 396-97 (6th Cir. 1993).

In this case, however, Apotex chose to file suit in the Northern District of Illinois, and as Mylan made clear below, the Seventh Circuit—relying on D.C. Circuit precedent—has held that "self-inflicted injuries break the causal chain linking the defendant's conduct to the asserted injury." *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 518 (7th Cir. 2010) (citing *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (R.B. Ginsburg, J.)). The D.C. Circuit likewise has

held that mere but-for causation is insufficient to establish traceability for Article III purposes. *See, e.g.*, *Fulani v. Brady*, 935 F.2d 1324, 1328-29 (D.C. Cir. 1991); *Shoreham-Wading River Cent. Sch. Dist. v. U.S. Nuclear Regulatory Comm'n*, 931 F.2d 102, 105 (D.C. Cir. 1991); *see also Huddy v. FCC*, 236 F.3d 720, 724 (D.C. Cir. 2001).

The application of these precedents forecloses Apotex's standing here. Even if Apotex somehow fixes its ANDA before Mylan's exclusivity ends, its supposed "injury" would materialize **only** because Apotex waited for years to file its ANDA while Mylan assumed all the risks by filing the first challenge to the '703 patent. The resulting "injury" is "self-inflicted" under any definition and of course results from third-party Mylan's "independent action": Apotex could have filed a Paragraph IV certification to the '703 patent the same day Mylan did, and—leaving aside the ongoing deficiencies in its ANDA—Apotex will be excluded from the market upon the '599 patent's expiration only because it chose to sit on its hands while Mylan undertook the risks that Hatch-Waxman's 180-day exclusivity period is intended to reward.

Apotex's own dilatory conduct and Mylan's praiseworthy initiative thus sever the causal chain between Daiichi's patent listing and

Apotex's alleged (if wholly speculative) injury. And as the Seventh Circuit's caselaw on these issues recognizes, it simply makes no sense to blame Daiichi for the predicament in which Apotex finds itself—not least of all since Apotex does not assert that Daiichi did anything illegal. Indeed, Apotex has **never** challenged the legitimacy of Daiichi's decision to list the patent in the Orange Book (and it acknowledges that the patent lawfully remains listed to this day, Blue Br. at 23 ("[I]t is settled law that a NDA holder is precluded from delisting a patent after it has been listed and an ANDA has been filed.")).

That likewise forecloses its standing. To be judicially cognizable, an Article III injury must be "fairly traceable to the defendant's *allegedly unlawful conduct*," *Allen v. Wright*, 468 U.S. 737, 751 (1984) (emphasis added), because "the traditional role of Anglo-American courts … is to redress … injury to persons caused by *private or official violation of law*." *Summers*, 555 U.S. at 492 (emphasis added). Yet having failed to allege that Daiichi did anything unlawful, it is simply bizarre that Apotex now seeks to "remedy" the natural consequence of Hatch-Waxman's exclusivity regime which (deficiencies in Apotex's ANDA aside) would result (if at all) from entirely lawful

58

conduct by the defendant. This is not the stuff of Article III standing, as the Seventh Circuit and the Supreme Court repeatedly have made clear. The application of regional circuit law and well-settled Supreme Court precedent thus would bar Apotex's standing here.

That said, we do not believe that this Court necessarily has to resolve the choice-of-law issue in order to affirm the dismissal of Apotex's lawsuit. The arguments presented in Sections II.A-II.C regarding Apotex's lack of tentative approval and the interpretation of the Hatch-Waxman Act are more than sufficient to reject Apotex's appeal, and they neither cast doubt on this Court's precedents nor require this Court to resolve the difficult matters raised here. But it would be irresponsible not to identify those issues and unfair to the panel to raise those issues for the first time in a potential petition for rehearing *en banc*—one we of course hope will prove unnecessary for the many reasons set forth above.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of Mylan's motions and affirm the dismissal of Apotex's complaint for lack of subject-matter jurisdiction.

59

July 14, 2014                    Respectfully submitted,

                                 /s/ Michael D. Shumsky
                                 Michael D. Shumsky
                                 John K. Crisham
                                 Stephen S. Schwartz
                                 KIRKLAND & ELLIS LLP
                                 655 Fifteenth Street, N.W.
                                 Washington, D.C. 20005
                                 (202) 879-5000

                                 *Counsel for Movant/Cross-Appellant*
                                 *Mylan Pharmaceuticals Inc.*

# CERTIFICATE OF COMPLIANCE

1.      I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) because it contains 11,928 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14 point Century Schoolbook font.

July 14, 2014                    /s/ Michael D. Shumsky
                                 Michael D. Shumsky

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 15th day of July 2014, he caused an electronic copy of Mylan's Corrected Combined Opening and Response Brief to be served on all counsel of record via this Court's CM/ECF filing system. The undersigned states that Mylan's original Combined Opening and Response Brief was filed yesterday via this Court's CM/ECF filing system. This corrected version corrects two typographical errors as noted in the Notice of Correction filed today, July 15, 2014.

July 15, 2014            /s/ Michael D. Shumsky
                             Michael D. Shumsky